UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No.: |
| ANN M. DISHINGER, JERROLD I. PALMER, and LAWRENCE M. PALMER, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), files its complaint and alleges that:

## SUMMARY

1. Defendants Ann Dishinger ("Dishinger"), Jerrold I. Palmer ("J. Palmer") and Lawrence M. Palmer ("L. Palmer") (collectively, "Defendants") committed securities fraud by engaging in illegal insider trading in the securities of Equifax Inc. ("Equifax" or "the company") in advance of Equifax's September 7, 2017

public announcement that the company had suffered a major cyber-intrusion and data breach (hereafter, "the data breach").

2. On August 15, 2017, shortly after Equifax discovered the data breach, Equifax's outside counsel retained a Chicago-based public relations firm to help Equifax manage the numerous government and media inquiries that the company expected to receive once the data breach was publicly disclosed.

3. Shortly after the public relations firm was engaged, Dishinger, then a finance manager for the firm, learned about the data breach through her employment at the firm. Though she did not trade herself, she tipped her significant other, L. Palmer, disclosing that the data breach had occurred.

4. Upon receiving Dishinger's tip, L. Palmer contacted a recent mortgage business client, who then purchased out-of-the money short-term Equifax put options in his own brokerage account. L. Palmer later reimbursed the business client for the majority of the cost of the options.

5. L. Palmer also disclosed the breach to his brother and office co-worker, J. Palmer. J. Palmer passed the information to a friend and convinced the friend to also purchase out-of-the money short-term Equifax put options in the friend's brokerage account.

6. On the day after Equifax's September 7 announcement of the data breach, Equifax's common stock share price dropped nearly 14%. The conduits used by L. Palmer and J. Palmer thereafter sold their Equifax put options for profits, respectively, of $34,848.90 and $73,398.74.

7. By the conduct detailed in this Complaint, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder. Unless enjoined, Defendants are likely to commit such violations again in the future.

8. The Commission seeks a judgment from the Court: (a) enjoining Defendants from engaging in future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder pursuant to Section 21(a) of the Exchange Act [15 U.S.C. § 78u(a)]; (b) ordering Defendants J. Palmer and L. Palmer to disgorge an amount equal to the profits reaped as a result of the actions described herein, with prejudgment interest, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), (7)]; and (c) ordering Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

## JURISDICTION AND VENUE

9. The Commission brings this action pursuant to Section 21(d) the Exchange Act [15 U.S.C. § 78u(d)].

10. The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

11. Defendants, directly or indirectly, used the means or instruments of interstate commerce, the mails, or the facilities of a national securities exchange in connection with the acts described herein.

12. Venue is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims made herein occurred in the Northern District of Georgia.

## DEFENDANTS

13. **Ann M. Dishinger**, age 52, is a resident of Deerfield, Illinois. She was an employee of a Chicago-based public relations firm from approximately September 2007 until January 2021. In 2017, she was a senior finance manager in the firm's Chicago headquarters.

14. **Lawrence M. Palmer**, age 59, is a resident of Glenview, Illinois. Upon information and belief, he is currently vice president of mortgage lending for a

Chicago-based company. In 2017, he was a vice president for a different mortgage lender in the same office location as J. Palmer.

15. **Jerrold I. Palmer**, age 61, is a resident of Glenview, Illinois. Upon information and belief, he is currently senior vice president of mortgage lending for a Chicago-based company. In 2017, he was a vice president for a different mortgage lender in the same office location as L. Palmer.

## OTHER RELEVANT ENTITY

16. **Equifax Inc.**, an information solutions and human resources company, is a Georgia corporation headquartered in Atlanta, Georgia. Equifax's common stock is registered under Section 12(b) of the Exchange Act and trades on the New York Stock Exchange under the symbol "EFX."

## STATEMENT OF FACTS

**I.    THE EQUIFAX CYBERSECURITY BREACH.**

17. On July 29, 2017, Equifax's security department observed suspicious network traffic within an internal system. Over the next several weeks, Equifax worked with a cybersecurity consulting firm to determine the scope of the intrusion.

18. By mid-August, the forensic investigation had revealed that the hackers had accessed the personally identifiable information of millions of consumers. Equifax

5

began preparing to announce the data breach to the public and establishing a remediation plan for impacted individuals.

19. On August 15, 2017, Equifax, through its outside counsel, engaged the data security and privacy crisis team at a Chicago-based public relations firm to help Equifax develop a plan to respond to the numerous government and media inquiries that the company expected to receive once the data breach was publicly disclosed.

## II. DISHINGER LEARNS OF THE EQUIFAX DATA BREACH.

20. In August 2017, Dishinger was a senior finance manager of the public relations firm engaged by Equifax. Part of her job duties and responsibilities included supporting new client engagements by drafting the scope of work documents, putting together pricing proposals, and making staffing decisions.

21. For at least the prior ten years while working for the firm, she annually had acknowledged receipt of the company's policy that client information, including client identity, was confidential.

22. Dishinger's work station in the firm's Chicago headquarters was a low-walled cubicle located on the same floor as the data security and privacy crisis team that was assigned to handle the Equifax engagement. The open layout of the

6

office area readily allowed conversations among finance department staff to be overheard.

23. Dishinger's cubicle was next to that of another employee of the public relations firm assigned to support the Equifax crisis team.

24. At the start of the engagement, Dishinger's co-worker in the next cubicle assisted in drafting the Equifax crisis team's scope of work and in reallocating workloads of team members to accommodate the Equifax project.

25. Dishinger overheard conversations between the co-worker and others on the Equifax crisis management team, thus learning about Equifax's engagement of her employer and the data breach within a day or so of the engagement occurring.

26. By August 18, 2017, based on nonpublic information belonging to her employer, Dishinger had learned that Equifax was the victim of a major cybersecurity breach.

27. Dishinger owed a duty of trust and confidence to her employer and its clients not to trade on the basis of material nonpublic information that she learned through her employment, and was aware of her duty.

28. Dishinger knew or was reckless in not knowing that the information that Equifax was the victim of a major cybersecurity breach was material.

29. Dishinger knew or was reckless in not knowing that the information that Equifax was the victim of a major cybersecurity breach was nonpublic.

### III. DISHINGER DISCLOSES THE EQUIFAX DATA BREACH TO L. PALMER.

30. By no later than the morning of Friday, August 18, 2017, Dishinger had tipped her significant other, L. Palmer, with news of the Equifax data breach.

31. At 11:19 a.m. on that Friday, a former business associate and recent mortgage client of L. Palmer's returned a call placed earlier that morning from L. Palmer. L. Palmer informed this individual that L. Palmer had heard rumors that Equifax had been hacked.

32. L. Palmer asked for advice on how to purchase options that would take advantage of what he thought would be bad news for the company. The former business associate knew that put option contracts would work for that purpose, and explained to L. Palmer which series of put options he could purchase.

33. L. Palmer asked his former business associate to purchase $1,000 in Equifax put options in his brokerage account, claiming that he himself did not have a brokerage account and suggesting that the circumstances were so urgent that he did not have time to open his own account.

34. In fact, L. Palmer had at least two brokerage accounts in his own name at the time.

35. Shortly after the phone call, L. Palmer's former business associate placed several orders to purchase a total of 40 put option contracts for Equifax common stock with a strike price of $130 and a September 2017 expiration date, for a total investment of $1,151.65. At the time, Equifax's common stock was trading between $138.05 and $142.22.

36. L. Palmer later reimbursed his former business associate for $1,000 of the funds used to purchase the put options. In the memo section of the check, L. Palmer wrote the words "Blue Horseshoe."

37. "Blue Horseshoe" was an apparent reference to Michael Douglas's instruction to Charlie Sheen in the 1987 movie *Wall Street* to use a coded message to convey inside information, namely, "[y]ou tell the man that Blue Horseshoe loves Anacott Steel."

38. L. Palmer knew or was reckless in not knowing that Dishinger owed a duty of trust and confidence not to disclose material nonpublic information that she learned through her employment.

39. L. Palmer knew or was reckless in not knowing that the information that Equifax was the victim of a major cybersecurity breach was material.

40. L. Palmer knew or was reckless in not knowing that the information that Equifax was the victim of a major cybersecurity breach was nonpublic.

### IV. L. PALMER DISCLOSES THE EQUIFAX DATA BREACH TO J. PALMER.

41. On or about Monday, August 21, 2017, L. Palmer tipped his brother and then office co-worker, J. Palmer, with the news of Equifax's data breach he had received from Dishinger.

42. Starting during the morning of August 21, 2017, J. Palmer began calling several friends to ask for assistance in purchasing Equifax put options.

43. At 10:46 a.m., he called a high school friend. During the call, J. Palmer asked about trading options and said he wanted to buy put options in the stock of a credit agency. The individual refused to assist.

44. At 10:52 a.m., J. Palmer called another high school friend. J. Palmer requested his help to buy puts in Equifax. This friend also refused to make the trades on J. Palmer's behalf.

45. At 10:56 a.m., J. Palmer called a third friend and they spoke for four minutes. The friend and J. Palmer exchanged two more brief phone calls that morning.

46. Later that same day, J. Palmer's third friend purchased 70 Equifax put options with a strike price of $130 and a September 2017 expiration date; the same type of options that L. Palmer's former business associate had acquired.

47. Throughout the day, the third friend and J. Palmer exchanged additional phone calls.

48. J. Palmer knew or was reckless in not knowing that the information about the data breach originated from his brother's significant other, Dishinger, and that Dishinger owed a duty not to disclose material nonpublic information that she learned through her employment.

49. J. Palmer knew or was reckless in not knowing that the information that Equifax was the victim of a major cybersecurity breach was material.

50. J. Palmer knew or was reckless in not knowing that the information that Equifax was the victim of a major cybersecurity breach was nonpublic.

V. **EQUIFAX TELLS THE PUBLIC ABOUT THE BREACH.**

51. After the close of the market on September 7, 2017, Equifax issued a press release and filed a Form 8-K with the Commission, announcing the cybersecurity breach and revealing that it potentially impacted approximately 143 million consumers in the United States.

52. On September 8, the price of Equifax common stock closed at $123.23, a drop of $19.49 (nearly 14%) per share from the prior day's closing price of $142.72. Trading volume that day also increased dramatically to nearly seventeen

million shares, more than a thirty-fold increase from the previous day's volume of approximately 518,000 shares.

53. L. Palmer and his former business associate exchanged three phone calls the evening of September 7, 2017, and also spoke by phone several times on September 8 and 11, 2017, during which time the former business associate sold all of his Equifax put option contracts for a total profit of $34,848.90.

54. Between September 11 and 25, 2017, L. Palmer's former business associate made three separate transfers totaling $35,000 from his brokerage account to his checking account. Thereafter, over the course of six weeks, from September 19 to October 29, 2017, the former business associate made four separate Venmo payments of $2,000 each to L. Palmer, and also gave him cash of $2,000 for a total of $10,000, representing the repayment of his $1,000 initial investment plus $9,000 in profits.

55. J. Palmer and the third friend who had agreed to purchase Equifax put options for him also exchanged several phone calls the evening of September 7, 2017, after the public announcement of the breach, and September 8.

56. Between September 8 and 11, J. Palmer's friend sold all of his Equifax put option contracts for a total profit of $73,398.74, approximately $28,000 of which he gave to J. Palmer.

## COUNT I – INSIDER TRADING IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

57. The Commission re-alleges and reincorporates paragraphs 1 through 56 as if fully set forth herein.

58. Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

59. By reason of the actions alleged herein, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(i) finding that Defendants violated Section 10(b) of the Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder as alleged herein;

(ii) permanently enjoining Defendants, pursuant to Section 21(a) of the Exchange Act [15 U.S.C. § 78u(a)], from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(iii) ordering Defendants J. Palmer and L. Palmer to disgorge an amount equal to the profits reaped as a result of the actions alleged herein and to pay prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), (7)];

(iv) ordering Defendants to each pay a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

(v) granting such other relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated this 15th day of August, 2022.

                                                    Respectfully submitted,

                                                    */s/ M. Graham Loomis*
                                                    M. Graham Loomis
                                                    Regional Trial Counsel
                                                    Georgia Bar No. 457868
                                                    Tel: (404) 842-7622
                                                    Email: loomism@sec.gov

                                                    W. Shawn Murnahan
                                                    Senior Trial Counsel
                                                    Georgia Bar No. 529940
                                                    Tel: (404) 842-7669
                                                    Email: murnahanw@sec.gov

                                                    COUNSEL FOR PLAINTIFF
                                                    Securities and Exchange Commission
                                                    Atlanta Regional Office
                                                    950 East Paces Ferry Road, N.E., Suite 900
                                                    Atlanta, GA  30326-1382
                                                    Tel (main): (404) 842-7600
                                                    Fax: (703) 813-9364